EXHIBIT 4 –FINDINGS OF FACT AND CONCLUSION OF LAW

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

FREDDIE CAGLE,

       Plaintiff,

       v.

KING'S WAY USA TRANSPORT,
INC., FIRST TIME TRANSPORT,
INC., ISIDRO ALEX LOBAINA
LOYOLA, ONE WAY HAULING
EXPRESS CO., AC NATIONWIDE
TRANSPORT, LLC, ARIEL
CALZADA, and ISABEL CORDERO,

       Defendants.

Civil Action No.

2:21-CV-52-RWS

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held a bench trial in this case on February 6, 2023 to determine

the amount of damages for which Defendants are liable to Plaintiff Freddie

Cagle.  Having considered the parties' pleadings, trial briefs, and evidence,

including testimony and exhibits presented at trial, the Court now makes the

following Findings of Fact and Conclusions of Law pursuant to Federal Rule of

Civil Procedure 52(a).[1]

## FINDINGS OF FACT

### I.    Procedural History

On March 5, 2021, Plaintiff filed this lawsuit [Dkt. 1], asserting claims for

negligent hiring, training, entrustment, retention, and maintenance (Counts I and II

against Defendants King's Way and First Time); negligence (Count III against

Defendant Loyola); vicarious liability (Count IV against Defendants King's Way

and First Time); punitive damages (Count V against Defendants King's Way, First

Time, and Defendant Loyola); and attorney's fees (Count VI against Defendants

King's Way, First Time, and Loyola).

On July 7, 2021, Plaintiff amended his Complaint to add several defendants

and claims against those defendants. Plaintiff's Amended Complaint [Dkt. 56]

---

[1] Federal Rule 52(a) requires a district court to issue findings of fact and conclusions of law whenever it conducts a bench trial. "The findings of fact must be specific enough for a reviewing court to identify the factual findings upon which the court's legal conclusions are based." Fulcher's Point Pride Seafood, Inc. v. M/V "Theodora Maria", 752 F. Supp. 1068, 1069 n.1 (S.D. Ga. 1990) (citing Stock Equip. Co. v. TVA, 906 F.2d 583, 592 (11th Cir. 1990)). The Court "need not, however, make a finding on every contention raised by the parties, but the findings must be sufficiently detailed to give a reviewing court a clear understanding of the analytical process by which the ultimate findings were reached." Id. (citation, punctuation, and quotations omitted).

asserts similar claims for negligent hiring, training, entrustment, retention, and

maintenance against additional Defendants One Way (Count VIII), AC Nationwide

(Count IX), Ariel Calzada (Count X), Isabel Cordero (Count XI), and claims for

vicarious liability against these additional defendants (Count XII) for the actions of

Defendant Loyola. Plaintiff's Amended Complaint also asserts claims for illegal

and double brokering against Defendants One Way, King's Way, and AC

Nationwide (Counts XIII through XVII). Finally, Plaintiff's Amended Complaint

alleges claims for punitive damages (Count XIX) and attorney's fees (Count XX)

against these new defendants.

The Court has entered default against Defendants King's Way, AC

Nationwide, Ariel Calzada, Isabel Cordero, One Way, and First Time [Dkt. 31,

107, 124].

On August 18, 2022, Plaintiff filed a Motion for Partial Summary Judgment

[Dkt. 125] against Defendant Loyola. On October 4, 2022, the Court entered an

Order granting Plaintiff's Motion for Partial Summary Judgment as to Defendant

Loyola [Dkt. 128].

## II.    Findings of Fact and Conclusions of Law as to Defendants in Default

Defendants King's Way, AC Nationwide, Ariel Calzada, Isabel Cordero,

One Way, and First Time [Dkt. 31, 107, 124] are in default and shall hereinafter be

referred to as "Defendants in Default." Accordingly, the facts alleged in the Complaint [Dkt. 1] and Amended Complaint [Dkt. 56] which pertain to Defendants in Default are deemed admitted and specifically incorporated here.

"A court is authorized to enter default judgment where a defendant has failed to plead or otherwise defend as provided by these rules." Fed. R. Civ. P. 55(a). "While modern courts do not favor default judgments, they are certainly appropriate when the adversary process has been halted because of an essentially unresponsive party." Freedom Plastics, Inc. v. Sparta Polymers, LLC, 2:11-CV-334-WCO, 2015 WL 13637255, at *1 (N.D. Ga. July 15, 2015) (omitting citations).

Further, "[a] default judgment … generally precludes a trial of the facts, except as to damages. A hearing to determine whether to enter judgment by default [pursuant to Rule 55] is not considered as a trial. If the court determines that the defendant is in default, his liability to the plaintiff is deemed established and the plaintiff is not required to establish his right to recover. The allegations of the complaint except as to the amount of damages are taken as true. If the default is established, the defendant has no further standing to contest the merits of plaintiff's right to recover. His only recourse is to show good cause for setting aside the default and, failing that, to contest the amount of the recovery." 3 Barron &

Holtzoff, Federal Practice & Procedure § 1216, pp. 85-86 (1958). See cases collected in Annot., 8 A.L.R.3d 1070 (1966). .... "The allegations of the complaint, in effect, become findings of fact. And, therefore, Rule 52 is inapplicable except as to damages." <u>Brown v. Kenron Aluminum & Glass Corp.</u>, 477 F.2d 526, 531 (8th Cir. 1973).

As the defendants are in default, their liability to Plaintiff is deemed established and Plaintiff is not required to further establish his right to recover. The allegations of the Complaint, except as to the amount of damages, are taken as true. The Defendants in Default are liable to Plaintiff on Plaintiff's claims for negligent hiring, training, entrustment, retention and maintenance, vicarious liability for the negligence of Defendant Loyola, and for attorney's fees and punitive damages.

This Court makes the following additional findings of fact about the nature of the Defendants in Default's business practices pertaining to Defendants in Default's liability for attorney's fees and punitive damages:

1. Defendants Ariel Calzada and Isabel Cordero are husband and wife.

*Defendant King's Way*

2. Defendant King's Way's president was Defendant Isabel Cordero.

3. Defendant King's Way's vice president was Defendant Ariel Calzada.

4. Defendant King's Way's address for business is 8711 NW 108 Street, Hialeah Garden, Florida 33018.

5. On January 10, 2014, Defendant King's Way filed an OP-1 application for operating authority.

6. Defendant King's Way's OP-1 application was signed under penalty of perjury by Defendant Ariel Calzada as President of Defendant King's Way.

7. Defendant King's Way, through its OP-1, declared under penalty of perjury that it had in place an individual for ensuring overall compliance with the Federal Motor Carrier Safety Regulations; could produce a copy of the Federal Motor Carrier Safety Regulations; had in place a driver safety training/orientation program; was familiar with DOT regulations governing driver qualifications and had in place a system for overseeing the driver qualification requirements; had in place policies and procedures to ensure compliance with DOT regulations regarding safe driving and operation of commercial motor vehicles, compliance with DOT regulations for hours of service, compliance with DOT regulations for vehicle inspections, and compliance with DOT regulations for maintenance.

8.  On January 13, 2014, the Federal Motor Carrier Safety Administration ("FMCSA") sent correspondence to instruct Defendant King's Way on how to complete the registration process.

9.  On February 4, 2014, the FMCSA sent correspondence to Defendant King's Way describing what documents were needed for Defendant King's Way to successfully complete the required safety audit.

10. On May 30, 2014, the FMCSA notated that Defendant King's Way was in an alert status for violation of the hours-of-service regulations citing a 67.1-percentile status, meaning only 32.9% of the motor carriers in the United States have more violations.

11. On May 30, 2014, the FMCSA notated that Defendant King's Way was in an alert status for maintenance regulatory violations citing an 87.4-percentile status, meaning only 13.6% of the motor carriers in the United States have more violations.

12. On June 20, 2014, the FMCSA notated that Defendant King's Way was in an alert status for violation of the hours-of-service regulations citing a 67.4-percentile status, meaning only 32.6% of the motor carriers in the United States have more violations.

13. On June 20, 2014, the FMCSA notated that Defendant King's Way was in an alert status for maintenance regulation violations citing an 86.9-percentile status, meaning only 13.1% of the motor carriers in the United States have more violations.

14. On July 18, 2014, a Defendant King's Way driver and a Defendant King's Way commercial motor vehicle were involved in a two-vehicle crash in California.

15. On July 24, 2014, a Defendant King's Way driver and a Defendant King's Way commercial motor vehicle were involved in a one-vehicle crash in Abilene, Texas.

16. On July 25, 2014, the FMCSA notated that Defendant King's Way was in an alert status for violation of the hours-of-service regulations citing a 78th-percentile status, meaning only 22% of the motor carriers in the United States have more violations.

17. On July 25, 2014, the FMCSA notated that Defendant King's Way was in an alert status for maintenance regulatory violations citing an 88th-percentile status, meaning only 12% of the motor carriers in the United States have more violations.

18. Defendant King's Way became inactive as a valid motor carrier on July 31, 2014.

19. From its beginning on January 10, 2014, to its inactivity, Defendant King's Way drivers and vehicles were inspected 29 times which resulted in 17.241% of its drivers having out-of-service violations and 35% of Defendant King's Way vehicles having out-of-service violations.

*Defendant AC Nationwide*

20. Defendant AC Nationwide's manager was Defendant Ariel Calzada, who was also the Vice President of Defendant King's Way.

21. On November 3, 2014, Defendant AC Nationwide filed an OP-1 application for operating authority.

22. Defendant AC Nationwide's OP-1 application was signed under penalty of perjury by Defendant Ariel Calzada as manager of Defendant AC Nationwide, just months after Defendant King's Way became inactive as a valid motor carrier.

23. Defendant AC Nationwide, through its OP-1, declared under penalty of perjury that, it had in place an individual for ensuring overall compliance with the Federal Motor Carrier Safety Regulations; could produce a copy of the Federal Motor Carrier Safety Regulations; had in place a driver

safety training/orientation program; was familiar with DOT regulations governing driver qualifications and had in place a system for overseeing the driver qualification requirements; had in place policies and procedures to ensure compliance with DOT regulations regarding safe driving and operation of commercial motor vehicles, compliance with DOT regulations for hours of service, compliance with DOT regulations for vehicle inspections, and compliance with DOT regulations for maintenance.

24. On November 4, 2014, Defendant AC Nationwide received a letter from the FMCSA on how to complete the registration process.

25. On December 4, 2014, the FMCSA sent a second letter to Defendant AC Nationwide requesting Defendant AC Nationwide validate the information in its application so that the required safety audit could be conducted.

26. On October 19, 2015, the FMCSA sent a letter placing Defendant AC Nationwide Out of Service/Revocation Warning for failure to attend the required safety audit.

27. On October 30, 2015, the FMCSA revoked Defendant AC Nationwide's operating authority and ordered Defendant AC Nationwide to cease all interstate motor carrier operations.

28. From its initial application submitted November 3, 2014, until its revocation, Defendant AC Nationwide had 68 inspections.

29. Of the 68 inspections, Defendant AC Nationwide drivers and equipment were placed out of service for having unsafe brakes, unsafe tires, damaged brake hoses and tubing, a failed breakaway emergency brake for the trailer, violation of the hours-of-service regulations including violation of the maximum hours of service, and drivers failing to speak English as required by the Federal Motor Carrier Safety Regulations.

*Defendant First Time*

30. Defendant First Time's president was Osiel Tellez.

31. Osiel Tellez is a driver for Defendant Ariel Calzada individually and on behalf of King's Way, One Way, AC Nationwide, and First Time, and is a driver under Defendant Ariel Calzada's direction and control.

32. Defendant First Time applied for operating authority in August of 2018.

33. On August 30, 2018, the FMCSA contacted Defendant First Time requesting Defendant First Time contact the FMCSA to schedule a safety audit.

34. On October 1, 2018, the FMCSA sent a second request for Defendant First Time to contact the FMCSA to schedule the required safety audit.

35. On April 17, 2019, the FMCSA sent Action Required: Out of Service/Revocation Warning Letter to Defendant First Time indicating Defendant First Time's operating authority would be revoked because Defendant First Time failed to contact the FMCSA to allow the required safety audit to be conducted.

36. On April 29, 2019, the FMCSA entered an order revoking First Time's operating authority and ordering it to cease interstate motor carrier operations.

37. Defendant First Time reapplied for operating status which was approved by a letter from the FMCSA on June 6, 2019, again requesting Defendant First Time schedule the required safety audit.

38. On July 8, 2019, the FMCSA sent a fourth request for Defendant First Time to contact the FMCSA to schedule the required safety audit.

39. On August 5, 2019, the FMCSA sent a second Action Required: Out of Service/Revocation Warning Letter because Defendant First Time failed to contact the FMCSA to schedule the required safety audit.

40. On August 16, 2019, the FMCSA revoked Defendant First Time's authority for a second time and ordered it to cease interstate motor carrier operations.

41. From December 2018 until the date of its revocation, Defendant First Time had a 99% unsafe driving alert with the FMCSA.[2]

42. From April 2019 until the date of its revocation, Defendant First Time had an alert status for Hours of Service Compliance ranging from 71–79%, meaning that only 21–29% of motor carriers in the United States were worse the Defendant First Time.[3]

43. From December 2018 until its revocation in August of 2019, Defendant First Time received an alert for vehicle maintenance violations with the FMCSA ranging from 82–92%, meaning that during this time period only

---

[2] The Court notes that after Defendant First Time's authority was revoked, Defendant First Time's Unsafe Driving alert percentage remained at 99%.

[3] The Court notes that that after Defendant First Time's authority was revoked, from September 2019 to January 2020, Defendant First Time had hours of service alert compliance percentiles of 77%, 75%, 77%, 79%, and 82%.

8–18% of motor carriers had worse vehicle maintenance ratings than Defendant First Time.[4]

*Defendant One Way*

44. Defendant One Way's president is Defendant Isabel Cordero, who was also the President of Defendant King's Way.

45. According to its MCS-150 form, Defendant One Way's principal place of business is 8711 NW 108 Street, Hialeah Garden Florida 33018, which is the same business address as that of Defendant King's Way.

46. Defendant One Way was granted operating authority on April 29, 2014.

47. On January 6, 2016, Defendant One Way's operating authority was involuntarily revoked.

48. On May 12, 2016, Defendant One Way's operating authority was reinstated.

49. Defendant One Way had previously paid Defendant Loyola by check for services performed prior to the day of the wreck.

50. Defendant Loyola did not know what company he was driving for at the time of the wreck, but believed he worked for Defendant Ariel Calzada.

---

[4] The Court also notes that from September 2019 until January 2020, Defendant First Time had an alert status for maintenance violations with percentiles of 89%, 90%, 90%, 89% and 90% for the respective months.

51. Defendant Loyola would arrive at the truck yard and Defendant Ariel Calzada would assign Defendant Loyola a truck to drive and provide instructions for the load Defendant Loyola was to haul.

*Illegal Brokering*

52. By default, Defendants King's Way, One Way, and AC Nationwide, for compensation, arranged the transportation of property by authorized motor carriers.

53. Defendants King's Way, One Way, and AC Nationwide were not registered with the FMCSA as brokers, in violation of 49 U.S.C. § 14916.

54. By default, Defendants King's Way, One Way, and AC Nationwide did not satisfy the financial security requirements under section 49 U.S.C. § 13906, 49 U.S.C. § 149.

55. Defendants King's Way, One Way, and AC Nationwide illegally brokered loads in violation of 49 C.F.R. § 371 *et seq.*

56. Defendants King's Way, One Way, and AC Nationwide, and their officers and members, which include Defendants Ariel Calzada and Isabel Cordero, are liable to Plaintiff for all valid claims incurred without regard to amount. 49 U.S.C. § 14916.

*All Defendants in Default*

57. On July 16, 2019, the day of Plaintiff's wreck, all Defendants in Default were engaged in interstate commerce as a motor carrier.

58. On July 16, 2019, the day of Plaintiff's wreck, all Defendants in Default were engaged in carrying property in interstate commerce.

59. On July 16, 2019, the day of Plaintiff's wreck, all Defendants in Default were operating a commercial motor vehicle.

60. On July 16, 2019, the day of Plaintiff's wreck, all Defendants in Default knew Defendant Loyola could not read or write English.

61. On July 16, 2019, the day of Plaintiff's wreck, Plaintiff was a member of the public.

The amount of damages is addressed below.

## III.   Findings of Fact and Conclusions of Law as to Defendant Loyola

On October 4, 2022, the Court entered an Order granting Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's negligence claim against Defendant Loyola [Dkt. 128]. Those facts contained in the Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment [Dkt. 125-2] and referenced in the Court's Order [Dkt. 128] are specifically incorporated here. In its Order [Dkt. 128], the Court concluded that Plaintiff satisfied the elements of

duty, breach, causation, and damages in his negligence claim against Defendant Loyola, which is also incorporated here. As stated in the Court's Order, "[n]ow that the substantive issues in this case have all been resolved, the only issues remaining for resolution are the amount of Plaintiff's damages" as they relate to Defendant Loyola.

## IV. Findings of Fact as to Plaintiff's Damages

1.  On July 16, 2019, fearing the overturned Freightliner truck driven by Defendant Loyola would crash into Plaintiff's car, Plaintiff took quick, evasive action and turned his car to the left, narrowly escaping the path of the Freightliner, causing him to travel off the roadway and down through the grassy median of the interstate.

2.  As Plaintiff tried to bring his car to a stop, his right foot became lodged between the floor and the brake pedal as he was violently thrown about within his car, striking his head. As a result, Plaintiff suffered serious injuries to his right foot and ankle and injuries to his head and back.

3.  After coming to a stop in the median, Plaintiff got out of his car, began experiencing dizziness, and had difficulty standing.

4.  When the police arrived and asked Plaintiff if he needed an ambulance, Plaintiff declined emergency transportation to the hospital because, at the time, he

did not believe he had suffered any serious injuries. Later that afternoon, the adrenaline wore off and the pain in Plaintiff's right foot began to intensify to a point where he sought emergency medical treatment.

5.      On the afternoon of July 16, 2019, the day of the wreck, Plaintiff went to the emergency room to check on the pain he was experiencing in his neck, back, and right foot/ankle.

6.      Upon arrival to St. Mary's Sacred Heart Hospital's emergency room, Plaintiff reported pain in his lower back, right foot, and right ankle. (Med Rec 000014.)

7.      After performing a physical examination in the emergency room, Plaintiff's medical providers noted visible swelling of his right ankle. (Med Rec 000014.) Based on his complaint of back pain and obvious swelling of his right foot, his medical providers ordered a CT scan of his spine and x-rays of his right foot and ankle. (Med Rec 000008–000010.)

8.      Plaintiff initially received the diagnoses of a lower back strain and sprains of his right foot and ankle, and he was discharged from the hospital. (Med Rec 000005.)

9.      On August 6, 2019, Plaintiff went to the emergency room of Northeast Georgia Medical Center with continued complaints of right foot and ankle pain, as well as lower back pain. (Med Rec 0000054.) The emergency room staff performed imaging of Plaintiff's foot and head, attempted to treat his pain with medication, and

ultimately discharged him home to follow up with his primary care physician, Dr. Harris. (Med Rec 000057, 000131.)

10.     Approximately one month before the wreck, Plaintiff had back surgery. (Med Rec 000175.) When the wreck happened, Plaintiff was still under the care of his pain management physician, Dr. Ellis, and his neurosurgeon, Dr. Grunch. After the wreck, Plaintiff followed up with Dr. Ellis and Dr. Grunch, both of whom noted Plaintiff's increased back pain and new, persistent pain in his right ankle caused by the wreck. (Med Rec 000043, 000147.)

11.     On August 13, 2019, Dr. Grunch's office, after reviewing his radiological imaging from the emergency room, referred Plaintiff to an orthopedist for his right foot/ankle pain due to continued pain and visible swelling. (Med Rec 000147.)

12.     In August and September of 2019, Plaintiff visited the office of orthopedist Dr. Gottsman of the Longstreet Clinic, where a physician's assistant initially saw him. (Med Rec 000155–000192.) Dr. Gottsman's office took x-rays of Plaintiff's right knee and right ankle and ordered an MRI of Plaintiff's right ankle. (Med Rec 000156, 000166.) After reviewing the MRI results on September 4, 2019, another orthopedist at Longstreet Clinic noted that Plaintiff's right ankle had "a peroneal tendon small split." (Med Rec 000194.)

13.   Wanting relief from the continuing pain and swelling in his right foot, Plaintiff saw a podiatrist, Dr. Mauro Rossi, on September 9, 2019. After reviewing the MRI of his right foot/ankle and performing his own assessment, Dr. Rossi recommended Plaintiff see an orthopedic surgeon. (Med Rec 000204.)

14.   On September 17, 2019, Plaintiff met with his primary care physician, Dr. Harris, to get his recommendation for an orthopedic surgeon. Dr. Harris referred Plaintiff to Dr. Yixi Lu, an orthopedic surgeon at Ankle and Foot Centers of Georgia. (Med Rec 000208.)

15.   On September 24, 2019, after examining Plaintiff and his MRI, Dr. Lu determined that the MRI showed "tearing and tendinosis of the peroneals, low lying muscle belly, [and] chronic ankle sprain of the CFL [calcaneofibular ligament] and ATFL [anterior talofibular ligament]." (Med Rec 000213–000214.)

16.   On September 24, 2019, Dr. Lu recommended Plaintiff proceed with surgery to repair the tendons and ligaments in his right foot. (Med Rec 000215.)

17.   On October 10, 2019, Plaintiff underwent a complex surgery on his right foot, including peroneal tendon repair. Plaintiff was placed under general anesthesia, and Dr. Lu repaired, removed, and transferred tendons in his right foot and ankle. Dr. Lu also removed a bone fragment of "significant size." (Med Rec 000313–000314.)

18.     The photograph below accurately depicts Plaintiff's right foot/ankle after the operation on October 10, 2019.



19.     Plaintiff spent the next four (4) days in the hospital undergoing physical therapy and pain management before being placed in a soft cast and released. (Med Rec 000261–000529.)

20.     On October 29, 2019, Plaintiff returned to Dr. Lu for a scheduled post-op visit, where he received a new splint for his right foot and was told to follow up in two

weeks. (Med Rec 000226.) As instructed, he followed up on November 12, 2019, and was transitioned to an Aircast. (Med Rec 000234.)

21.     Plaintiff returned for his next post-op visit on December 16, 2019. While Plaintiff's foot appeared to be healing well, Dr. Lu ordered physical therapy to help strengthen and stabilize the ankle. (Med Rec 000240–000241.)

22.     Plaintiff began physical therapy on January 3, 2020. After examining Plaintiff's right ankle, his physical therapist saw "significant atrophy and weakness present [throughout] the entire [right] ankle complex." (Med Rec 000532–000533.)

23.     On January 10, 2020, Plaintiff returned to his physical therapist, who informed Plaintiff that he could perform his exercises at home. (Med Rec 000535.) The physical therapist made this suggestion to save Plaintiff from making the hour-long drive to the therapist's office twice a week for the next six weeks. After discussing this at length with his physical therapist, Plaintiff agreed to perform his exercises at home and received therapy bands and instructive pictures of the exercises he was to do at home. (Med Rec 000535–000536.)

24.     On February 6, 2020, Plaintiff returned to Dr. Lu, who observed ankle swelling and continued pain in Plaintiff's right foot/ankle and that Plaintiff was unable to feel anything in his small toe. (Med Rec 000248). Dr. Lu administered two injections to help with the pain and swelling and discussed the possibility of

performing an additional surgery on his right foot to help with the pain and instability. (Med Rec 000249.) Dr. Lu wanted to see if the injections were successful before making a final decision on the surgery. Dr. Lu also referred Plaintiff to get fitted for a personalized foot/ankle brace to help provide stability. (Med Rec 000249.)

25.    On February 19, 2020, Plaintiff went to the Hanger Clinic, where his right foot was evaluated for a custom-fabricated brace. (Med Rec 000539–000541.) After Plaintiff received his personalized foot/ankle brace, he wore it daily for several months.

26.    Despite his recent injections and wearing his brace, Plaintiff continued to experience pain and swelling in his right ankle and foot, which caused him significant pain well into the late spring and early summer of 2020. (Med Rec 000253.)

27.    Due to the COVID outbreak, Plaintiff could not return to Dr. Lu until May 11, 2020. During his visit, Dr. Lu informed Plaintiff that Dr. Lu had exhausted his options and offered to refer Plaintiff for a second opinion. (Med Rec 000254.)

28.    Still in significant pain, Plaintiff sought a second opinion from Dr. Joseph Johnson, an orthopedic surgeon at Athens Orthopedic Clinic who specializes in the foot and ankle. Plaintiff first saw Dr. Johnson in June 2020. Dr. Johnson reviewed

Plaintiff's prior medical records and had Plaintiff undergo another MRI in July 2020, scheduling Plaintiff to return in August to review the MRI results. (Med Rec 000550–000551.)

29.     The results of the July 2020 MRI revealed the following:

    a.  Severe tendinosis and partial tearing of the peroneus brevis and longus;

    b.  Lateral ankle ligament sprain and partial tearing most severe at the calcaneofibular ligament;

    c.  Posterior tibial tenosynovitis without tear;

    d.  Chronic sprain of the spring and deltoid ligaments; and

    e.  Additional findings of mild conditions. (Med Rec 000572–000573.)

30.     By the time of his appointment on August 3, 2020, Plaintiff was experiencing excruciating pain in his foot and ankle, making it nearly impossible for him to walk. At the appointment, Dr. Johnson noted Plaintiff had a significant ATFL and CFL injury and informed Plaintiff of excess fluid in Plaintiff's foot. Dr. Johnson told Plaintiff he would need to undergo a second surgery to address these conditions. (Med Rec 000552.)

31.     Dr. Johnson performed the second surgery on Plaintiff's right foot a couple weeks later, on August 18, 2020. Dr. Johnson repaired and replaced torn ligaments in Plaintiff's right ankle, performed a debridement and repair of torn and injured

tendons in Plaintiff's right foot, and excised and repaired injured nerves in Plaintiff's right foot which had caused him pain. (Med Rec 000591–000593.)

32.     After undergoing his second surgery, Plaintiff continued to experience pain and swelling in his foot and ankle into September 2020. His foot began to develop an abscess and, as Dr. Johnson noted, was "exquisitely tender to palpation along the course of the incision." (Med Rec 000554.)

33.     The photograph below fairly and accurately depicts the state of Plaintiff's right foot on September 17, 2020.



34.     By September 17, 2020, Plaintiff's foot had become severely infected, causing Dr. Johnson to send Plaintiff back to the hospital that same day. Dr. Johnson performed yet another surgical procedure (Plaintiff's third foot surgery) to help combat the infection. Dr. Johnson extended the excision site, performed an

aggressive debridement of the infected tissue with a scalpel and rongeur, and cleaned up the wound. (Med Rec 000766–000767.)

35.    Plaintiff remained in the hospital for a total of seven (7) days. (Med Rec 000745–001099.) While at the hospital, infectious disease doctor Mark Visitacion began to see, monitor, and treat Plaintiff. (Med Rec 000763–000765, 000821–000826.) Before being discharged home, Plaintiff underwent a painful procedure to have a PICC line catheter inserted into his chest through his upper arm to administer antibiotics intravenously. (Med Rec 000842.)

36.    Upon returning home from the hospital on September 24, 2020, Plaintiff received care from Tugaloo Home Healthcare. Nurses from Tugaloo assisted Plaintiff transferring from bed to chair, getting on and off a toilet, walking ten feet, putting on and removing shoes, as well as administering antibiotics intravenously through the PICC line in his arm. (Med Rec 001234–001237.) Plaintiff received antibiotics intravenously two to three times a day from September 26 to October 26, 2020. (Med Rec 001218–001219.)

37.    From September 24, 2020, through December 13, 2020, Plaintiff received periodic care from Tugaloo Home Healthcare, including physical therapy, check-ins, and lab sample draws. (Med Rec 001220, 001469.)

38.     After returning home from the hospital on September 24, 2020, Plaintiff continued to see infectious disease specialist Dr. Visitacion to treat and monitor Plaintiff's postoperative right ankle infection. (Med Rec 001143–001155.)

39.     On December 1, 2020, Plaintiff complained to Dr. Visitacion of stabbing pain in his right foot/ankle. (Med Rec 001145.) After seeing no evidence of a need to restart antibiotics, Dr. Visitacion referred Plaintiff back to Dr. Johnson for continued orthopedic care. (Med Rec 001149–001150.)

40.     In January and February of 2021, Plaintiff visited Dr. Johnson for regular checkups of his right foot and ankle. On February 22, 2021, Dr. Johnson planned to have Plaintiff fitted for a heel wedge to provide support for his foot. (Med Rec 000560.)

41.     Plaintiff has since received this heel wedge and wears it inside his shoes for support.

42.     To this day, Plaintiff continues to experience some pain, swelling, and instability in his right foot and ankle. Dr. Johnson has opined that Plaintiff's ankle will never return to the condition it had maintained prior to the wreck of July 16, 2019. (Affidavit of Joseph Johnson, M.D.)

43.     Before the wreck, Plaintiff enjoyed outdoor activities such as walking outdoors, performing yard work, and attending University of Georgia football

games. The injury to Plaintiff's foot has significantly limited his mobility, interfered with his normal living and limited his activities, which in turn has interfered with his enjoyment of life and impaired his bodily health and vigor.

44.     Plaintiff has experienced mental anguish and fear associated with seeing the large Freightliner truck suddenly turn over and approach Plaintiff's car from behind, causing his need to take evasive action. Plaintiff has also experienced fear and mental suffering arising from the extent of his injuries.

45.     Following his initial medical attention, Plaintiff believed he had suffered an ankle sprain that would heal quickly. When his condition failed to improve but instead worsened, he experienced a great deal of worry about the full extent of injuries. His fear and worry increased upon learning he needed surgery on his foot. His anxiety was further compounded by the need for subsequent surgeries and their failure to resolve his pain. During the course of his medical treatment, Plaintiff has considered the possibility that he might lose his foot due to the extent of his injuries.

46.     Plaintiff suffered pain at the time of and immediately after the wreck which resulted from injuries he sustained, primarily in his right foot. Plaintiff's pain and suffering have been continuous to the time of trial. His pain reached heights both before and after the three surgical procedures he had in 2019 and 2020. His

complaints of pain resulted from the injuries he received in the wreck. The defendants introduced no evidence relating to Plaintiff's injuries.

47.     Plaintiff's medical bills in the amount of $310,800.42 were reasonable and necessary and resulted from his injuries proximately caused by the wreck on July 16, 2019.

## CONCLUSIONS OF LAW

## I.     Conclusions of Law Relating to Damages

### 1.

Damages are given as pay or compensation for injury done. GEORGIA CODE ANNOTATED § 51-12-4.

### 2.

Necessary expenses resulting from an injury are a legitimate item of damages. As for medical expenses such as hospital, doctor, and medicine bills, the amount of the damage would be the reasonable value of such expenses as was reasonably necessary. GEORGIA CODE ANNOTATED § 51-12-7.

### 3.

Plaintiff is entitled to damages for medical expenses in the amount of $310,800.42.

4.

Pain and suffering is a legal item of damages. The measure is the enlightened conscience of the Court. Questions of whether, how much, and how long the plaintiff has suffered or will suffer are for the Court to decide. Redd v. Peters, 100 Ga. App. 316 (1959). Avery v. Schneider, 356 Ga. App. 304 (2020) ("In the case of a bench trial, the amount of damages awarded is within the enlightened conscience of the trial judge.").

5.

Pain and suffering includes mental suffering. Mental suffering is a legal item of damage in this case because Plaintiff also experienced physical suffering.

6.

In evaluating Plaintiff's pain and suffering, the Court may consider the following factors, all of which Plaintiff has proven: interference with normal living; interference with enjoyment of life; impairment of bodily health and vigor; fear of extent of injury; shock of impact; actual pain and suffering, past and future; mental anguish, past and future; and the extent to which the plaintiff must limit activities. Food Lion v. Williams, 219 Ga. App. 352 (1995).

7.

Plaintiff's pain and suffering will continue into the future.

8.

Plaintiff is entitled to damages for pain and suffering in the amount of $2,700,000.

## II. Attorney Fees as to the Defendants in Default

9.

Plaintiff is entitled to damages for attorney's fees from the Defendants in Default for their bad faith conduct and stubborn litigiousness, under GEORGIA CODE ANNOTATED § 13-6-11. See Complaint [Dkt. 1] ¶¶ 118–119, First Amended Complaint [Dkt. 56] ¶¶ 282–285.

10.

For an award of attorney fees, a claimant must "prove the actual costs of his attorneys and the reasonableness of those costs." Holland v. Cypress Insurance Company, No. 2:17-cv-00120, 2022 WL 4289144 (N.D. Ga. 2017), at *3, citing Hardnett v. Ogundele, 291 Ga. App. 241, 245 (2008).

11.

A contingency fee agreement is "a guidepost to the reasonable value of the services the lawyer performed." Holland v. Cypress Insurance Company, at *4, citing Georgia Dept. of Corrections v. Couch, 295 Ga. 469 (Ga. 2014).

12.

"A court may consider a contingent fee agreement and the amount it would have generated as evidence of usual and customary fees in determining both the reasonableness and the amount of an award of attorney fees. When a party seeks fees based on a contingent fee agreement, the party must show that the contingency fee percentage was a usual or customary fee for such case and that the contingency fee was a valid indicator of the value of the professional services rendered. In addition, the party seeking fees must also introduce evidence of hours, rates, or some other indication of the value of the professional services actually rendered." Holland v. Cypress Ins. Co. (2020), at *3, quoting Home Depot U.S.A. v. Tvrdeich, 268 Ga. App. 579, 584 (2004) (citations and quotations omitted).

13.

Under GEORGIA CODE ANNOTATED § 13-6-11, "fees are based on bad faith. …. [T]he intent is to punish the wrongdoers by making them pay the attorney fees for the prevailing party. This is not about a mathematical apportionment of costs. The statute contemplates that all of a plaintiff's fees and costs will be paid by the defendant so long as they are customary and reasonable. A contingent fee is customary and reasonable in personal injury cases. Almost without exception, that is the cost the plaintiff will have in the case." Holland, 2022 WL 4289144, at *7.

14.

Plaintiff entered into a fee agreement between Plaintiff and counsel which provides for a contingent fee of 40% of the gross proceeds of recovery in the event Plaintiff filed a lawsuit.

15.

Plaintiff's counsel are attorneys who specialize in personal injury cases. The 40% contingency contract for cases going to trial is standard in Georgia. This fee request is not an outlier; it is what is expected in cases of this kind. This fee was agreed to by counsel and Plaintiff's client at the beginning of the case, and it represents the expectations of both should the litigation be successful.

16.

Plaintiff's counsel have a wealth of combined experience practicing law and enjoy a good reputation in Georgia, Tennessee and across the country. Danny Ellis was recently voted the Tennessee Trial Lawyer Association's trial lawyer of the year. Mark Alexander serves on the State Bar of Georgia's Board of Governors.

17.

Plaintiff's counsel also submitted time records showing 1,032.65 hours through January 13, 2023, which did not include hours Plaintiff's counsel expended responding to Defendant Wesco's Motion for Partial Summary

Judgment, final trial preparation, and trial. Plaintiff's counsel supplemented his time records at trial. The number of hours Plaintiff's counsel has expended pursuing Plaintiff's claims is reasonable.

18.

"A reasonable hourly rate is determined by the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Kinnard v. Kelly, No. 1:08-cv-001824-JOF, 2010 WL 761230, at *5 (N.D. Ga. Mar. 2, 2010) (internal quotes and citation omitted). "The relevant legal community is the area in which the court sits …." Id. at *5 n. 10 (internal quotes and citation omitted). Hayes Lemmerz Int'l-Georgia, Inc. v. Punch Prop. Int'l NV, 2:09-CV-21-RWS, 2013 WL 3191084, at *5 (N.D. Ga. June 20, 2013).

19.

A prevailing market rate for litigation services of this type in the North Georgia area is $350 per hour for lead counsel.

20.

This case involves several novel and difficult issues. The wreck involved multiple vehicles and serious injuries to individuals who brought separate actions in separate courts. Also, with the exception of Defendant Loyola, the Defendants

have refused to participate in the litigation of this case, complicating Plaintiff's discovery efforts. Each of these have created issues outside the normal auto accident case.

21.

Because of the novel issues involved, special skills and knowledge are required. Because of their experience in this field, Plaintiff's counsel possesses the skill and knowledge needed to address the novel issues involved.

22.

The preclusion of other employment is a significant factor because Plaintiff's counsel do not manage a high volume of cases but are selective in accepting cases. Thus, it is important that they be adequately compensated for the cases they do accept.

23.

Finally, this case involves factors that could be viewed as making the case difficult or undesirable to pursue. The lack of insurance coverage and the limited amount of the MCS-90 bond created unique challenges in pursuing the case.

24.

The contingent fee is reasonable and customary and is what is expected in this kind of work. Based on these expectations, counsel has not only invested their time; counsel has fronted all expenses associated with the litigation.

25.

Plaintiff is entitled to attorney fees and litigation expenses from the Defendants in Default in the amount of $1,304,320, 40% of the gross recovery.

## III.   Punitive Damages

26.

Punitive damages, when authorized, are awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant. <u>Alliance Transp., Inc. v. Mayer</u>, 165 Ga. App. 344, 345 (1983).

27.

In considering the amount of punitive damages, the Court may consider the following factors:

1) the nature and egregiousness (reprehensibility) of the defendant's conduct;

2) the extent and duration of the defendant's wrongdoing and the likelihood of its recurrence;

3) the intent of the defendant in committing the wrong;

4) the profitability of the defendant's wrongdoing;

5) the amount of actual damages awarded; and

6) the financial circumstances, that is, the financial condition and/or the net worth of the defendant.

In re Bailey, 451 B.R. 640, 645 (Bankr. S.D. Ga. 2011), citing Hosp. Auth. of Gwinnett Cnty. v. Jones, 259 Ga. 759, 764 (1989) cert. granted, vacated on other grounds, 499 U.S. 914 (1991), judgment reinstated 261 Ga. 613 (1991); Hosp. Auth. of Gwinnett Cnty. v. Jones, 261 Ga. 613, 614 (1991).

28.

In making an award of punitive damages, the Court should consider the degree of reprehensibility of the defendant's wrongdoing. In assessing reprehensibility, the Court may consider whether:

a) the harm caused was physical, as opposed to economic;

b) the conduct showed an indifference to or a reckless disregard of the health or safety of others;

c) the target of the conduct had financial vulnerability;

d) the conduct involved repeated actions or was an isolated incident;

e) the harm was the result of intentional malice, trickery, or deceit (or mere accident)

Craig v. Holsey, 264 Ga. App. 344, 351 (2003).

29.

To further the Court's analysis relating to the conscious indifference the Defendants in Default exhibited, 49 C.F.R. § 391.1 establishes the "minimum qualifications for persons who drive commercial motor vehicles as, for, or on behalf of motor carriers." 49 C.F.R. § 391.1 also establishes the minimum duties required of a motor carrier, like the Defendants in Default, to determine the qualifications of a driver.

30.

A motor carrier is charged with only allowing a qualified individual to drive a commercial motor vehicle. *See* C.F.R. § 391.11(a). A driver is found to be qualified if the following are met:

(1) Is at least 21 years old;

(2) Can read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records;

(3) Can, by reason of experience, training, or both, safely operate the type of commercial motor vehicle he/she drives;

38

(4) Is physically qualified to drive a commercial motor vehicle in
accordance with subpart E—Physical Qualifications and
Examinations of this part;

(5) Has a currently valid commercial motor vehicle operator's
license issued only by one State or jurisdiction;

(6) Is not disqualified to drive a commercial motor vehicle under
the rules in § 391.15; and

(7) Has successfully completed a driver's road test and has been
issued a certificate of driver's road test in accordance with §
391.31, or has presented an operator's license or a certificate of
road test which the motor carrier that employs him/her has
accepted as equivalent to a road test in accordance with § 391.33.

49 C.F.R. § 391.11(b).

31.

Defendant Loyola was an unqualified driver, and the Defendants in Default
had actual knowledge that Defendant Loyola was not qualified to drive a
commercial motor vehicle.

32.

Because of the danger posed by large tractor trucks on the highway,
permitting an unqualified driver to operate a loaded commercial motor vehicle
weighing 80,000 pounds is wanton and reckless.

33.

All Defendants in Default made express representations under penalty of
perjury to the FMCSA that the Defendants in Default would comply with the
FMCSA. Despite their express representations, all Defendants in Default engaged
in joint ownership, common management, common control, and had familial
relationships thus making the Defendants in Default reincarnated motor carriers as
defined by 49 C.F.R. § 385.1003. All Defendants in Default engaged in a practice
whereby they attempted to circumvent FMCSA oversight by using common
management, common control and had familial relationships to mask and conceal
the noncompliance and the history of noncompliance in violation of 49 C.F.R.
§ 385.1005. All Defendants in Default attempted to evade the requirements of the
Federal Motor Carrier Regulations by engaging in a practice known as "chameleon
carriers" or reincarnated carriers. Attempting to avoid FMCSA scrutiny by
engaging in common ownership, common management, common control, and
common familial relationship is wanton and reckless. The Defendants in Default

knew that such conduct is prohibited by the Federal Motor Carrier Safety Regulations. This Court finds by clear and convincing evidence that this intentional misconduct to engage in a chameleon carrier or reincarnated carrier plan was a cause of the crash.

34.

Based upon the well-pled complaint allegations, fair inferences, and conclusions of facts to be drawn from those allegations, as well as other evidence in the record and presented at the evidentiary hearing, the Defendants in Default's negligent hiring, training, retention, and entrustment of Defendant Loyola caused physical and economic harm to Plaintiff, violated the Federal Motor Carrier Safety Regulations, and showed a conscious indifference for the health and safety of others. Plaintiff has established by clear and convincing evidence that he is entitled to punitive damages against the Defendants in Default.

## IV. Apportionment of Fault

35.

Because multiple of the Defendants are liable for Plaintiff's damages, the Court must "apportion its award of damages among the persons who are liable according to the percentage of fault of each person." GEORGIA CODE ANNOTATED § 51-12-33(b). The apportionment statute does not eliminate an

employer's liability of an employee within the scope and course of the employer's business. Accordingly, apportionment is required even though the Defendants in Default are vicariously liable for the negligence of Defendant Loyola. See Quynn v. Hulsey, 950 S.E.2d 725, 730 (Ga. 2020) ("Even accepting that claims for negligent entrustment, hiring, training, supervision, and retention, in those cases where the employer concedes that it will be vicariously liable under the doctrine of respondeat superior if its employee is found negligent, are derivative of the employee's tortious conduct to some extent, that would not relieve the jury from apportioning fault under the plain language of the apportionment statute.") (citation and quotation omitted).

36.

The Court concludes that fault should be apportioned equally between Defendant Loyola and the Defendants in Default – 50% to Defendant Loyola and 50% to Defendants in Default. Defendants in Default are liable for the damages arising from their own negligence, and because they employed Defendant Loyola at the time of the accident, they are also vicariously liable to Plaintiff for Defendant Loyola's liability.

**Summary of Damages/Judgment**

37.

Plaintiff shall have a judgment against Defendant Loyola for:

- Compensatory damages for $1,505,400.21 (50% of the total award for medical expenses and pain and suffering).

38.

Plaintiff shall have a judgment against Defendants in Default (Ariel Calzada, Isabel Cordero, First Time, King's Way, AC Nationwide, and One Way) for:

- Compensatory damages of $1,505,400.21 (50% of the total award for medical expenses and pain and suffering),
- Punitive damages of $250,000.00, and
- Attorney's fees of $1,304,320.

39.

Defendants in Default are vicariously liable to Plaintiff for Defendant Loyola's liability.

40.

The judgment against Defendant Loyola is $1,505,400.21, and the total judgment against the Defendants in Default is $4,565,120.42 (when including Defendant Loyola's liability).

43

**SO ORDERED** this 14th day of February, 2023.

_Richard W. Story_

_____

**RICHARD W. STORY**
United States District Judge