Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                  GAINESVILLE DIVISION
 3              CASE NO.:  2:23-cv-140-RWS
 4
    FREDDIE CAGLE,
 5
         Plaintiff,
 6
     -vs-
 7
    NATIONAL INDEMNITY
 8  COMPANY OF THE SOUTH and
    OLD REPUBLIC INSURANCE
 9  COMPANY,
10       Defendants.
    _____/
11
12       DEPOSITION OF:  YADIEL CORDERO
13       DATE:           Thursday, June 6, 2024
14       TIME:           1:00 p.m. - 3:47 p.m.
15
         PLACE:          DIEGUEZ & ASSOCIATES, PLLC
16                       7950 NW 155 Street
                         Suite 207
17                       Miami Lakes, Florida 33016
18
19
         STENOGRAPHICALLY
20       REPORTED BY:    VANESSA OBAS, RPR
21
22
23
24
25
```

Yadiel Cordero                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 9

1      Q.   So can you state your full name?

2      A.   Yes.  My name is Yadiel Calzada Cordero.

3      Q.   Okay.  And what's your present address?

4      A.   16213 Northwest 84th Place, Miami Lakes,

5   Florida 33016.

6      Q.   Okay.  How long have you lived there?

7      A.   Since 2020.

8      Q.   Okay.  And it's my understanding that you live

9   with your mother.  Is that still --

10     A.   That is correct, yes.

11     Q.   Okay.  Are you currently employed?

12     A.   I am.

13     Q.   Are you employed anywhere other than with One

14   Way?

15     A.   No.

16     Q.   Who else works with One Way?

17     A.   No, just me.  Me and my dad.

18     Q.   Just you?

19     A.   Yes.

20     Q.   And Ariel is still --

21     A.   Is my father, yes.

22     Q.   Have you worked with any other trucking company

23   besides One Way?

24     A.   No.

25     Q.   When did you begin working for One Way?

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 3 of 24
Yadiel Cordero                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 12

1    Q.   Were you at all involved in setting up One Way?

2    A.   In setting up?  No.  No.

3    Q.   I'm presuming that means you were not at all

4    involved in setting up any of the other companies that I

5    previously listed?

6    A.   No.  No.

7    Q.   Okay.  What were your responsibilities in 2019

8    with One Way?

9    A.   Really just -- just help, you know, whatever my

10   dad needed help with.  He's not very fluent in English,

11   so, you know, that's what I'll be there for.  Then, you

12   know, obviously, I learned English and I'll help him

13   out.

14   Q.   Were you involved with dispatch in 2019?

15   A.   Yes, it was just help.  So if you need it, I'll

16   be there, yeah.  So yes.

17   Q.   In 2019, did you deal with insurance?  Did you

18   help with the insurance?

19   A.   No, not really.  Not really, no.

20   Q.   Now do you deal with dispatch?

21   A.   With dispatch, yeah.

22   Q.   Now do you deal with insurance?

23   A.   With insurance, I do, but it's -- you know, my

24   dad is the one that takes care of those stuff.

25   Q.   In 2019 or now, were you involved -- or are you

Page 13

```
 1    involved in accident investigations for any of the

 2    trucks for One Way?

 3         A.   No.  No.

 4         Q.   In 2019 or now, did you help deal with driver

 5    qualifications?

 6         A.   No.

 7         Q.   In 2019 or now, did you or do you help with

 8    brokering loads?

 9         A.   Yes.

10         Q.   In 2019 or now, did you or do you help with

11    acquiring loads?

12         A.   With acquiring loads, yes.

13         Q.   And when you say, "yes," is that for both 2019

14    and now or just now?

15         A.   2019 and now.  2019, it was more so help when

16    it was -- when it was needed from me.  But now it's

17    just -- it will be just me.  I'll be the person you have

18    to talk with about any loads or anything like that.

19         Q.   Okay.

20         A.   Yeah.

21         Q.   In 2019 and/or now, do you decide what driver

22    takes what load?

23         A.   It just does depend.  But it's more so, you

24    know, dad just tells me, you know, what driver gets the

25    load.  So that's the way we go about it.
```

Yadiel Cordero                                      June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

                                                        Page 14

1        Q.   So typically your father will tell you, and you

2    may help make that happen.  You don't ever choose the

3    driver on your own?

4        A.   No.  No, I don't.

5        Q.   Do you determine what operating authority the

6    loads go under?

7        A.    No.  And in all operating -- it goes under One

8    Way.

9        Q.   How do you convey the load information to the

10   drivers?

11       A.   So I would just send them a text with -- with

12   their information or the brokers would, you know, send

13   it to the drivers so I wouldn't have -- I don't have to,

14   you know, send it to the drivers.  But most of the time

15   when we meet, you know, sending that information to the

16   drivers.

17       Q.   Do you keep these texts?

18       A.   Yes.  Yeah.  Uh-huh.

19       Q.   Do you keep them anywhere other than on your

20   cell phone?

21       A.   No.  No.  Only my cell phone.

22       Q.   Can I have your cell phone number?

23       A.   Yeah.  (305) 479-5479.

24       Q.   Do you provide the truckers with the bill of

25   lading?

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 6 of 24
Yadiel Cordero                                          June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 22

1              MS. DEMASI:  Sorry.  What was the answer to

2         that question?

3              MR. ELLIS:  He doesn't remember.

4              MR. BRANTLEY:  He doesn't know.  "I don't

5         remember."

6              MR. ELLIS:  Thank you.  Yeah.

7              MR. DIEGUEZ:  You didn't say "slash."  It

8         doesn't really mean the same thing.

9    BY MS. FIELDS:

10        Q.   Okay.  Let's move on.  And from what I

11   understand, you don't remember much about this accident

12   or know much about it.

13        A.   Nope.

14        Q.   But I just want to check generally to see.

15             For this load that was being transported on

16   July 16, 2019, at the time of this accident, do you know

17   how Mr. Loyola came to be the driver of this load?

18        A.   It was probably assigned by my dad.

19        Q.   Okay.  Do you know how the load being carried

20   on July 16th, 2019, was offered to the motor carrier?

21        A.   Which motor carrier?  Oh, it would be One Way?

22        Q.   It would be -- on the accident report, it says

23   that First Time Transport was the commercial motor

24   carrier.

25             Do you have a reason to believe that it was not

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 7 of 24
Yadiel Cordero                                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 23

1    First Time Transport?

2         A.    I don't remember.

3         Q.    Okay.  More generally --

4         A.    Yes.

5         Q.    -- and now with what you do with One Way --

6         A.    Uh-huh.

7         Q.    -- how does a load get offered to One Way as

8    the motor carrier?

9         A.    So I'll book the load.  You know, if my dad

10   told me, "hey, he needs the load," I'll book the load if

11   he needs it from me.  And then, you know, he will take

12   care of that and to, you know, what driver he gives the

13   load to.  That's about it.

14        Q.    Okay.  Do you know how your father decides who

15   drives these loads?

16        A.    No.

17        Q.    Do you know how it's decided what truck the

18   drivers will drive?

19        A.    No.

20        Q.    Do you know what documents are retained that

21   relate to any of these previous questions such as who

22   drives, what truck they drive, so on and so forth?

23        A.    No.

24        Q.    When you say, "no," does that mean you don't

25   know if there are documents, or there are no documents?

Yadiel Cordero                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 24

1      A.    There are no documents that I -- that I give,

2    so --

3      Q.    Do you know if your father has documents

4    relating to that?

5      A.    I don't think so, no.

6      Q.    At the time of this accident on July 16th,

7    2019, do you know who was on this trip with Mr. Loyola?

8      A.    I don't remember, no.

9      Q.    Do you know who contacted Mr. Loyola regarding

10   this delivery?

11     A.    No.  No, I don't.

12     Q.    You don't recall if you texted him and let him

13   know that he would be the one driving this load?

14     A.    No.  No, it wasn't me.

15     Q.    It was not you?

16     A.    No.

17     Q.    Okay.  Do you know who it would have been?

18     A.    Probably my dad.  My father.

19     Q.    Did your father handle all dispatch in 2019 at

20   the time of this accident?

21     A.    Most of it.  But I -- like I said, I was help

22   when he needed it.

23     Q.    Was there anyone else helping him at the time

24   of this accident?

25     A.    No.  Not at the moment, no.  No.

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 9 of 24
Yadiel Cordero                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 31

1          MS. FIELDS:  I think -- can I take a few

2     minutes to look over my notes and then --

3          MR. ELLIS:  Absolutely.

4          THE VIDEOGRAPHER:  The time on the monitor is

5     2:16 p.m.  We're going off the record.

6          (Thereupon, a recess was taken, after which the

7     proceedings continued as follows:)

8          THE VIDEOGRAPHER:  The time on the monitor is

9     2:26 p.m., and we're back on the record.

10    BY MS. FIELDS:

11        Q.   Okay.  Earlier I had asked you about the

12    documents when there's a delivery of these loads, and

13    you had mentioned two potential documents, the bill of

14    lading and then you mentioned a delivery document.

15          Is that delivery document a separate document

16    from the bill of lading, or is that just the bill of

17    lading that's been signed off on?

18        A.   I'm sorry.  So it's only one document.

19        Q.   Okay.

20        A.   And then that's the one on the -- so when they

21    received the load, they sign it as proof of delivery.

22    So it's one document.

23        Q.   Going back again, you said you deal with

24    booking the loads now.

25        A.   Uh-huh.

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 10 of 24
Yadiel Cordero                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 32

1        Q.   When you book a load, how do you do that?  Is

2    that through a website?

3        A.   Yeah, through a website.  Uh-huh.

4        Q.   What website?

5        A.   DAT.

6        Q.   DAT?

7        A.   Correct.

8        Q.   In 2019, would that be the same?

9        A.   Yeah, because when I would do it in 2019, I

10   would send over the password, you know, and all the

11   information.  And it has always been DAT since -- since

12   I started helping.

13       Q.   Okay.  I want to look one more time at this

14   photograph that I handed you.

15       A.   Uh-huh.

16       Q.   Does this logo right here -- do you have any

17   familiarity with it whatsoever?

18       A.   No.

19       Q.   You don't recognize that at all?

20       A.   No.

21       Q.   When did you learn of this accident?

22       A.   The exact day, I don't -- I don't remember.

23   But my dad just -- he was just talking to me on the

24   phone and he -- you know, he told me about it.

25       Q.   Do you recall if it was soon after the accident

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 11 of 24
Yadiel Cordero                                  June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 41

1            (Defendants' Exhibit Number 18, 2023 Tax

2        Returns for One Way Hauling, was marked for

3        Identification.)

4    BY MR. ELLIS:

5        Q.    And, then, I think these are the 2023 we marked

6    as Number 18.

7        A.    Okay.

8        Q.    Okay.  Again, those are the records that you

9    went and found and sent to your attorney?

10       A.    Correct.

11       Q.    And these are the complete tax returns for

12   2023?

13       A.    Correct.

14       Q.    Awesome.

15            I want to go back to the 2019 tax records.

16            But before I do, you're the current president

17   of One Way Hauling?

18       A.    Correct.

19       Q.    And when did you take that title?

20       A.    I took the title after my parents split up.

21       Q.    Split?  That would have been 2023?

22       A.    Yeah.

23       Q.    Okay.  So from 2023 forward, would you be the

24   person most knowledgeable about the workings of One Way

25   transportation?

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 12 of 24
Yadiel Cordero                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 43

1    transportation of goods?

2         A.   Correct.

3         Q.   And people would pay you for that?

4         A.   Uh-huh.  Uh-huh.  Yes.

5         Q.   Is that a "yes"?

6         A.   Yes.  Yes.

7              MR. DIEGUEZ:  He means the corporation.

8              THE WITNESS:  Sure.

9    BY MR. ELLIS:

10        Q.   So One Way Hauling is a motor carrier engaged

11   in the transportation of goods for compensation?

12        A.   Correct.

13        Q.   That's what it means to be for-hire.

14        A.   Okay.  Got it.

15        Q.   So in 2014, One Way Hauling was a for-hire

16   corporation?

17        A.   Yes.

18        Q.   In 2015, One Way was a for-hire transportation

19   company?

20        A.   Yes.

21        Q.   Or transportation motor carrier.

22        A.   Uh-huh.

23        Q.   2016, for-hire transportation motor carrier?

24        A.   Yes.

25        Q.   And I know this is redundant.  2017,

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 13 of 24
Yadiel Cordero                              June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 44

1    transportation for-hire?

2        A.    Yes.

3        Q.    2018 One Way is a for-hire motor carrier?

4        A.    Yes.

5        Q.    2019, One Way Hauling is a for-hire motor

6    carrier?

7        A.    Yes.

8        Q.    All the way up until today?

9        A.    Correct.  To this date.

10       Q.    To this date.

11             On July 16th, 2019, One Way Hauling was a

12   for-hire motor carrier?

13       A.    Yes.

14       Q.    Now I'm going to go to the 2019 tax records.

15             MR. DIEGUEZ:  He's got it.

16             MR. ELLIS:  No, he's got the --

17             MR. DIEGUEZ:  Oh.

18             MR. ELLIS:  Somebody's getting a call.  Do we

19         need to take a break real quick?  Not that it's

20         bothering me, but they're really --

21             MR. DIEGUEZ:  No.  It's okay.  My process

22         server is telling me we got somebody.

23             MR. ELLIS:  Well, that's extremely important.

24   BY MR. ELLIS:

25       Q.    All right.  Mr. Calzada, I'm going to hand you

Yadiel Cordero                              June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 47

1              MR. DIEGUEZ:  It's Number 7.

2              MR. ELLIS:  Thank you.

3    BY MR. ELLIS:

4       Q.   I want to show you again Exhibit 7 to your

5    mom's deposition.  I've turned the page to a specific

6    W-9.

7       A.   Uh-huh.

8       Q.   There is a Mr. Loyola there.

9            Do you see that W-9?

10      A.   Yes, uh-huh.

11      Q.   So, in 2019, Mr. Loyola would have worked for

12   One Way Hauling?

13      A.   Yes.

14      Q.   And he would -- would that have been as a truck

15   driver for One Way Hauling?

16      A.   Yes, uh-huh.

17             MR. ELLIS:  We're at 19; is that right?

18             MR. DIEGUEZ:  19 is Number 7.

19             MR. ELLIS:  No, no, no.  We're at Exhibit 19.

20             MR. DIEGUEZ:  We marked it already.

21             MR. ELLIS:  No, it's right here.

22             MR. DIEGUEZ:  That's 19.

23             You're going to mark it now?

24             MR. ELLIS:  No, I'm going to pass it over.

25             Melody, I'm producing what I've marked Number

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 15 of 24
Yadiel Cordero                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 48

1        19.   This is a ledger that we gave in discovery

2        yesterday.

3             (Defendants' Exhibit Number 19, Ledger, was

4        marked for Identification.)

5    BY MR. ELLIS:

6        Q.   Mr. Calzada, when drivers would get paid, did

7    your dad -- would your dad make a ledger of the payments

8    to the drivers; do you know?

9        A.   So if he would keep track of each payment?

10       Q.   Yes.

11       A.   Yes, uh-huh.

12       Q.   Okay.  And this is a ledger that's labeled as

13   One Way Hauling for Mr. Isidro Lobaina Loyola.

14            Do you see that?

15       A.   Would that be --

16       Q.   The Number 19, yes, sir.

17       A.   Okay.

18            MR. DIEGUEZ:  In the bottom.

19   BY MR. ELLIS:

20       Q.   That's what this document is; right?

21       A.   Yes.

22       Q.   It's a payment ledger?

23       A.   Yeah.

24       Q.   And then looking at the very last entry, it has

25   "check" and then it has a date.

Case 2:23-cv-00140-RWS     Document 90-3     Filed 07/17/24     Page 16 of 24
Yadiel Cordero                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 49

1              Do you see that?

2        A.    Yes.

3        Q.    Can you tell me the date that you see, the very

4    last entry?

5        A.    July 15, 2019.

6        Q.    So the day before this wreck, Mr. Loyola was

7    getting a paycheck from One Way Hauling?

8        A.    Yes, uh-huh.

9        Q.    Okay.  And if I may have that back just real

10   quick.

11             So -- no, no, the tax return, please.

12       A.    Oh, sorry.

13       Q.    I've got one more to ask you about.

14             MR. DIEGUEZ:  So you want him to leave this one

15        for now?

16             MR. ELLIS:  Yeah, that's going to be -- you can

17        put that back up here now.

18   BY MR. ELLIS:

19       Q.    Do you know if Mr. Loyola got paid for the

20   portion of the route that he ran at the time of the

21   wreck?

22       A.    No.

23       Q.    Okay.  Well, under oath, he testified that he

24   never got paid.

25       A.    Okay.

Page 54

1      Q.    No?

2      A.    No.  That's not my mother's signature.

3      Q.    That's not your mom's signature?

4      A.    No.

5      Q.    Okay.  Are you aware of a lease between King's

6    Way and One Way regarding trucks?

7      A.    No.

8      Q.    If you look on the lease agreement there --

9      A.    Uh-huh.

10     Q.    -- on Number 11, you see the 2014 Freightliner?

11     A.    Yeah.

12     Q.    All right.  You see the VIN number?

13     A.    Yes.

14     Q.    Okay.  I want you to compare that VIN number to

15   the VIN number in Document 2, which is the crash report.

16   Right there.  Perfect.

17           And if you need help of me pointing it out, I

18   can do that for you.

19     A.    Yeah, I see here the VIN.

20     Q.    And then compare it to that 2014.

21     A.    Same VIN number.

22     Q.    Yes.  It's the same VIN number?

23     A.    Correct.

24     Q.    Same truck?

25     A.    Uh-huh.

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 18 of 24
Yadiel Cordero                        June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 55

1        Q.   Is that a "yes"?

2        A.   Yes.   2014.

3        Q.   Okay.  So do you know if -- who would I need to

4     ask about the lease -- that lease agreement in Number

5     11 --

6             THE WITNESS:  Oh, it's right here.

7     BY MR. ELLIS:

8        Q.   Okay.  So my question again, who would I need

9     to ask about Document 11 for the lease agreement?

10       A.   My father, yeah.

11       Q.   Mr. Calzada, does your father keep the trucking

12    records -- business records for One Way at a certain

13    place -- that's a terrible question.

14            Do you know where your dad keeps the records

15    for One Way Hauling?

16       A.   No.

17       Q.   When you book the load --

18       A.   Uh-huh.

19       Q.   Okay.  I'm going to back up.

20            In 2019, when you booked the load through

21    DAT --

22       A.   Correct.

23       Q.   I assume that's some kind of a board that you

24    go to?

25       A.   Yes.

Page 56

1        Q.   You put in the bid?

2        A.   It's not so much you put in a bid.  It's the

3    load is posted.

4        Q.   Right.

5        A.   All the information you need, so how much you

6    pay, where is it going, any instructions that they give.

7        Q.   Uh-huh.

8        A.   Just posted up there.  It would never be a bid.

9        Q.   Okay.  So it's a load from Miami to

10   Gainesville, Florida, $2,000, has to be there,

11   refrigerated, blah, blah?

12       A.   Just like that.

13       Q.   We'll pay you two grand, and you would say

14   "accept"?

15       A.   Uh-huh.

16       Q.   Is that a "yes"?

17       A.   Yes.

18       Q.   And so it's whoever accepts it fastest?

19       A.   Correct.  Yeah.

20            MR. DIEGUEZ:  I don't know.

21   BY MR. ELLIS:

22       Q.   And when you accept the bid, do you get -- is

23   an e-mail generated?

24       A.   Yeah.  An e-mail is sent to the One Way e-mail

25   that they already have in the file when they look up the

Yadiel Cordero                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 57

1    company.

2         Q.   Got you.

3         A.   Yeah.

4         Q.   Now, would your dad go to the DAT load board

5    and do the same thing?

6         A.   Yes.

7         Q.   Did you watch your dad do that?

8         A.   I have.  I have watched him do it.  He knows.

9         Q.   Have you seen him do it for any other company,

10   other than One Way?

11        A.   No.

12        Q.   You were asked a question about did you know

13   about any other employees in 2019.  Obviously, the tax

14   return would show all the employees paid or contractors

15   working for One Way in 2019.

16        A.   Uh-huh.

17        Q.   Is that a "yes"?

18        A.   Yes.  But --

19        Q.   Go ahead.

20        A.   They're not employees at the office.

21        Q.   Right.

22        A.   Okay.

23        Q.   And --

24             MS. DEMASI:  Danny, I'm sorry to interrupt.

25        You cut out on that question, so I missed all of it.

Case 2:23-cv-00140-RWS    Document 90-3    Filed 07/17/24    Page 21 of 24
Yadiel Cordero                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 59

1          MS. DEMASI:  You're good.

2     BY MR. ELLIS:

3          Q.   In 2019, would your dad be the one to pay the

4     drivers for One Way?

5          A.   Yes.

6          Q.   In 2019, One Way Hauling did not have -- let

7     me -- I'm assuming something.  Let me start anew.

8               Do you understand the process of brokering a

9     load for trucking?

10         A.   Yes.

11         Q.   Okay.  You understand -- do you understand that

12    in 2019 and even today, to broker a load, you have to be

13    registered with the Federal Motor Carrier Safety

14    Administration?

15         A.   Yes.

16         Q.   One Way Hauling is not registered as a broker;

17    correct?

18         A.   Yeah.  No, it's not registered as a broker.

19         Q.   It's just registered as a for-hire motor

20    carrier, and always has been?

21         A.   Correct, yes.

22              MR. ELLIS:  All right.  I believe I'm going to

23         pass the witness.

24              Thank you so much.

25              THE WITNESS:  Thank you.

Yadiel Cordero                                    June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 71

1        A.    No.  No, not very often.

2        Q.    Did you know Mr. Loyola?

3        A.    I -- yes, I did.

4        Q.    Had you dispatched him before?

5        A.    I don't remember.

6        Q.    And I'm sorry if someone's already asked you

7     this question.

8        A.    Yes.

9        Q.    What was the name of the other person who was a

10    dispatcher in 2019?

11       A.    In 2019, it was Andy.  I don't know his last

12    name.

13       Q.    When did he leave?

14       A.    It was later 2019.  Exact date, I don't know,

15    but it was later that year.

16       Q.    What company employed Mr. Loyola?

17       A.    One Way.

18             MR. ELLIS:  I'm going to -- yeah.

19             MR. BRANTLEY:  Objection.

20             MS. DEMASI:  Yeah.  That was a bad question.

21       Let me try that again.

22    BY MS. DEMASI:

23       Q.    So do you know if Mr. Loyola was an employee of

24    One Way?

25       A.    If he was an employee of One Way?

Page 72

1      Q.   Yes.

2      A.   Yes.

3      Q.   But you don't know if he was an employee of any

4   other motor carriers as well; right?

5      A.   That is correct.

6      Q.   I believe that Mr. Ellis showed you a ledger

7   earlier.

8           Am I understanding correctly that One Way

9   Hauling would make payments to Loyola for loads that

10  were transported?

11     A.   Yes.

12     Q.   When Mr. Loyola would transport loads, would he

13  be paid after the load was delivered?

14     A.   Yes, when the load was complete.

15     Q.   So he would not preemptively be paid for loads?

16     A.   No.

17     Q.   Do you know if he was paid for the load being

18  transported at the time of this accident?

19     A.   No.

20     Q.   Do you know how he was paid, if it was by the

21  mile or per the load?

22     A.   Yes.  It's for completing the load.  It's

23  always been a fixed rate.

24     Q.   Do you know if he received any payment from

25  First Time for the load?

Yadiel Cordero                                June 6, 2024
Cagle, Freddie v. National Indemnity Company of the South

Page 76

1        Q.    Were you ever asked any questions by Ryder or

2    Old Republic about prior accidents?

3        A.    No.

4        Q.    Were you ever asked any questions by Ryder or

5    Old Republic about the accident at issue?

6        A.    No.

7        Q.    Did you ever lie to Ryder or Old Republic about

8    the accident at issue?

9        A.    No.

10       Q.    Do you know if Ryder or Old Republic ever asked

11   your father about prior accidents?

12       A.    I don't remember.

13       Q.    Do you know if Ryder or Old Republic ever asked

14   your father about the accident at issue?

15       A.    No.

16       Q.    Do you know if your father ever lied to Ryder

17   or Old Republic about the accident at issue?

18       A.    No.

19       Q.    Sorry.  No, you don't -- that was a bad

20   question.

21             No, you don't know, or, no, he did not?

22             MS. FIELDS:  Object to the form.

23             THE WITNESS:  No, he did not.

24             MS. DEMASI:  I am going to share my screen.  I

25       don't know if this document was made an exhibit in